# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| JOHNNY T.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 C 8671 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| ANDREW SAUL, Commissioner of Social Security, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff applied for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381a, 1382c, about five years ago. (Administrative Record (R.) 155-161). He claimed that he became disabled as of April 4, 2014 (R. 155, 180), due to high blood pressure, congestive heart failure, and kidney disease. (R. 180). Over the next two years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) in November 2017, and the parties consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c) on January 25, 2018. [Dkt. #10]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

**I.**

Plaintiff was born on March 6, 1973, and was 41 at the time his claims he became unable to work, and just 31 when he quit working for good. (R. 155, 180). Prior to that, he worked as a janitor for the CHA for about ten years and then as a temp for a service agency sporadically for another five years. (R. 163-164, 197). He wasn't clear on whether he was laid off or whether he was fired because of a disagreement with his boss. (R. 38-40). He thought he could do a desk job but not anything where he had to stand because his legs cramp. (R. 52).

The medical record covering plaintiff's treatment in this case is scant as these cases go; not even 100 pages. (R. 237-311). The plaintiff refers to fewer than 20 pages in support of his claim for benefits. [Dkt. # 14, at 3-6]. Indeed, the focus of plaintiff's argument for overturning the ALJ's decision is a single report from a psychiatrist who examined plaintiff once at the request of his attorney. [Dkt. # 14, at 9-14]. As such, we will dispense with a tedious review of the medical evidence and recount only that evidence that matters to the plaintiff in our analysis of his arguments.

After an administrative hearing – at which plaintiff, represented by counsel, and a vocational expert testified – the ALJ determined he was not disabled. The ALJ found that plaintiff had the following severe impairments: congestive heart failure and hypertension. (R. 15). The ALJ then found that plaintiff's impairments, either singly or in combination, did not meet or equal a listed impairment assumed to be disabling in the Commissioner's listings, referring specifically to Listing 4.02 covering heart failure (R. 17). The ALJ found that plaintiff had no severe mental impairment, rejecting the assessment of the consulting examiner because the plaintiff didn't allege a mental impairment – his reasons for not being able to work were physical – the medical record made absolutely no mention of any mental health issues, and the examiner saw plaintiff on a single

2

occasion. (R. 15-16, 22).

The ALJ then determined that plaintiff could perform light work light work – which requires lifting/carrying 20 pounds occasionally and 10 pounds frequently – with the exception that he could only be on his feet standing/walking for four hours a day, two hours at a time, and sitting about six hours a day. (R. 17). He could not work at heights, climb ladders, or frequently negotiate stairs, and he had to avoid operating moving or dangerous machinery. (R. 17). The ALJ then summarized the medical record (R. 17-22), saying that he found plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for reasons explained in this decision." (R. 19). Specifically, the ALJ cited plaintiff's daily activities and inconsistent statements as that "other evidence." (R. 18-19). The ALJ then addressed the medical opinion evidence, giving "good weight" to the opinion of the consultative medical examiner because it was consistent with her objective findings and the treatment record. (R. 21). He, again, gave little weight to the consulting psychiatrist who examined plaintiff at the request of plaintiff's attorney. (R. 22).

Next, the ALJ – relying on the testimony of the vocational expert – found that plaintiff was capable of performing Light work that exists in significant numbers in the national economy. Examples of such work were: packer (DOT #559.687-074, 300,000 jobs), sorter (DOT #222.687-022, 50,000 jobs), and (DOT #739.687-030). (R. 23). Accordingly, the ALJ concluded that plaintiff was not disabled and was not entitled to SSI under the Act. (R. 23).

## II.

If the ALJ's decision is supported by substantial evidence, the court on judicial review must

3

uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). It's a low hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek*, 139 S.Ct. at 1154, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

But, in the Seventh Circuit, the ALJ also has an obligation to build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence

4

and the result.").[2]

On the other hand, the Seventh Circuit has described the logical bridge requirement as "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir.2008). Indeed, the Seventh Circuit has allowed that even a sketchy opinion is sufficient if it assures a reviewing court that an ALJ has considered the important evidence and enables the court to trace his reasoning. *Mogg v. Barnhart*, 199 F. App'x 572, 576 (7th Cir. 2006); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). Viewed properly, the "logical bridge" requirement is not about *elegantia juris or* aesthetics. The ALJ need not build the Pont Neuf. A simple span will suffice so long as it allows the reviewing court to traverse the divide between the evidence and the ALJ's conclusions. *Mogg v. Barnhart*, 199 F. App'x 572, 576 (7th Cir. 2006); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). Perfection is no more required in a Social Security case than in any other kind of case. *Damayanti v. Gonzales*, 209 F. App'x 601, 603 (7th Cir. 2006); *Wilcox v. Comm'r of Soc. Security*, 2018 WL 4090328, at *4 (W.D.N.Y. 2018). The ALJ's explanations here more than satisfy the obligations of *Sarchet.*

### III.

The plaintiff raises two arguments[3] in favor of overturning the ALJ's decision: (1) the ALJ's

---

[2] The rule in non-social security cases appears to be different. *Compare, Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record, . . . ."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties, . . . No matter, because we may affirm on any basis that appears in the record.").

[3] Any other arguments the plaintiff might have raised are deemed waived. *See Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013); (arguments not raised in district court are waived); *Skarbek v. Barnhart*,
(continued...)

5

rejection of the consulting psychiatrist's opinion was not supported by substantial evidence and was flawed by legal error; and (2) the ALJ's conclusion that plaintiff could do jobs that exist in significant numbers in the national economy was not supported by substantial evidence. As it happens, the plaintiff's issues with the ALJ's decision turn on two competing views of what expert witnesses bring to the table. The plaintiff wanted the ALJ to believe his expert witness – the psychiatrist his attorneys sent him to – and disbelieve the Social Security agency's expert witness – the vocational expert who testified at his administrative hearing. The ALJ chose the agency's expert. Under the circumstances of this case, the ALJ's conclusion should not be disturbed.

**A.**

We start with Dr. Amdur. Plaintiff applied for SSI on April 25, 2014. (R. 155-61). He was already represented by counsel at that time. (R. 97-98). His application was denied, initially, on August 28, 2014. (R. 78-86). The medical record at that time was sparse, and there was no inkling of anything resembling a psychological impairment. The doctor who reviewed the record for the Agency determined that plaintiff could do light work and had no other limitations. (R. 82-83). It was shortly thereafter, on September 10, 2014, that plaintiff's counsel sent him to Dr. Amdur to have a psychiatric examination. (R. 269). Dr. Amdur recounted his mental status examination of plaintiff:

> [Plaintiff] walked with normal gait. There is no bizarre or inappropriate behavior, but as noted throughout the interview he is slumped and withdrawn, consistent with depression. He is mildly obese. Personal hygiene and grooming were modest. He sat calmly through the interview. His attention could be focused and he generally seemed to understand the questions put to him. He was cooperative. He seemed moderately tense and apprehensive. Speech was relevant and coherent but very apathetic. Speech was slowed and underproductive. He spoke softly. His voice was weak. The conversation was easily directed. Affect was prominently blunted and depressed. At

---

[3](...continued)
390 F.3d 500, 505 (7th Cir. 2004).

> times, he seemed vaguely annoyed with questioning. There is marked avoidance of eye contact. There are no delusions. There are paranoid trends, ideas of reference. There is prominent social phobia. He does not travel independently. Somatic preoccupations are marked. He has credible complaints of shortness of breath, fatigue, and pain. Auditory hallucinations are at least moderate.
>
> [Plaintiff] said the current Mayor was "Romney." He correctly named the current President and three additional recent past Presidents. He was asked to name two recent news events and gave one correct response. He was asked to name five big cities and gave four correct responses. He spelled "world" forwards correctly but could not spell it backwards. He correctly named the 12 months of the year in order. [Plaintiff] was administered the Montreal Cognitive Assessment. He attained a score of 20 out of 30 indicating the presence of at least moderate cognitive impairment. He performed particularly poorly on the tests of visuospatial functioning.

(R. 272). From there, Dr. Amdur goes on to assess plaintiff's capacity for work, saying that:

> Independent of [Plaintiff's] physical complaints he presents as prominently depressed with slumped posture, slowed, underproductive speech, withdrawal, and restricted affect. Although his reasoning is vague he does not travel independently on public transportation. For both physical and psychiatric reasons [Plaintiff] lacks the endurance to perform simple repetitive work. He would be unable to relate to co-workers and supervisors because of social withdrawal. He would be unable to travel independently to the workplace. He would be unable to tolerate work stresses. If awarded disability benefits, [plaintiff] is capable of managing funds independently.

(R. 272-73).

Based on the fact that plaintiff did not allege a psychological impairment, the fact that plaintiff denied having one at his hearing, and the fact that there was no mention of any psychological issues in the medical record before plaintiff was sent to Dr. Amdur, the ALJ determined that any psychological impairment would not have more than a minimal affect on his ability to work and was non-severe. (R. 16). The ALJ went on to explain that he gave little weight to Dr. Amdur's opinion because the plaintiff had never reported depression before or after Dr. Amdur's (brief) consultative exam, never received any treatment for such an impairment, and cited only his alleged physical ailments as reasons why he could not work. The opinion was inconsistent

7

with the medial evidence[4] and Dr. Amdur was a non-treating source. The ALJ also added that it could not be ignored that the opinion was the product of a referral from plaintiff's disability attorney. (R. 22).

All of these are valid reasons for an ALJ to accord less weight to a doctor's opinion. Even a treating physician's opinion may be accorded less weight if it is inconsistent with the other medical evidence. *Burmester v. Berryhill*, 920 F.3d 507, 512 (7th Cir. 2019); *Winsted v. Berryhill*, 915 F.3d 466, 472 (7th Cir. 2019). As the ALJ indicated, Dr. Amdur saw plaintiff once. *See Brown*, 845 F.3d at 252 ("whether the physician examined the claimant" and "whether the physician treated the claimant, and if so, the duration of overall treatment and the thoroughness and frequency of examinations" are factors in the weight to be accorded a physician's opinion"). The doctors and nurses at the clinic plaintiff went to regularly saw him often – at least every couple of months. (R. 274-311). There was never any mention of depression or auditory hallucinations; more importantly, the healthcare providers never mentioned any of the things Dr. Amdur observed. These were things that would have been obvious if they were occurring with a well-know patient: markedly restricted

---

[4] It might also have been said that the opinion was internally inconsistent and/or unsupported. *See Burmester v. Berryhill*, 920 F.3d 507, 512 (7th Cir. 2019);*Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019) Dr. Amdur did not review any of the three years' worth of medical evidence on the plaintiff's condition. (R. 269). While Dr. Amdur opines that plaintiff would be unable to travel independently to work (R. 272), it's unclear why. He was able to take the red line to the hearing (R. 33), and admits to driving even though his license has been suspended. Dr. Amdur appears to have glommed onto plaintiff's comment that he doesn't regularly take public transit because he has no where to go. (R. 272). On the other hand, Dr. Amdur feels plaintiff would have no problem handling any funds he might be awarded as a result of his disability claim (R. 273), despite the fact that plaintiff himself said he was not capable of handling money. (R. 189). Dr. Amdur also states that plaintiff lacks the "endurance" to perform simple repetitive work. (R. 272). Again, it's not clear why. While Dr. Amdur reported that a cognitive functioning test revealed a moderate cognitive impairment, mostly in the area of visuospatial functioning, Dr. Amdur makes no connection between that and endurance. Moreover, ". . . even a moderate[] limitation in an area of mental functioning 'does not prevent an individual from functioning satisfactorily.'" *Sawyer v. Colvin*, 512 F. App'x 603, 611 (7th Cir. 2013).

affect, overt depression, withdrawal, speech problems, etc. Similarly, just a month before Dr. Amdur's assessment, plaintiff was examined by Dr. Palaccio in connection with his application for benefits. Her mental status assessment, albeit brief, also made no mention of any of these overt, prominent signs:

> The claimant was alert and oriented to time, place and person. The claimant could recall 3 out of 3 items. The claimant knew that the President was Obama. The claimant could do simple arithmetic including addition, subtraction and multiplication. The affect was normal. Overall cooperation was excellent.

(R. 266). That was, admittedly, an exceedingly brief assessment but, nevertheless, it was as if Dr. Amdur was meeting with a completely different individual than the one who met with Dr. Palaccio or, indeed, went regularly to the clinic. As such, as the ALJ pointed out, Dr. Amdur's opinion is not consistent with *any* medical evidence in the record. *See Brown*, 845 F.3d at 252 ("whether other medical evidence supports the physician's opinion" is a factor in the weight to be accorded a physician's opinion).

Generally, a treating doctor's notes should be accorded more weight that those of a one-time examiner, *Plessinger v. Berryhill*, 900 F.3d 909, 915 (7th Cir. 2018); *McFadden v. Berryhill*, 721 F. App'x 501, 505 (7th Cir. 2018); *Israel v. Colvin*, 840 F.3d 432, 437 (7th Cir. 2016); *Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017), and that's what the ALJ did here. An ALJ may discount the opinion of a consultative examiner – or even that of a treating physician – as long as he provides good reasons for doing so. *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016);

But, the plaintiff argues for a different rule in cases where there is no record of any psychological impairment or claim of disability based on any psychological impairment and where a one-time examiner opines that the plaintiff is disabled due to a psychological impairment. For this,

9

the plaintiff cites the following passage from *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995):

> The medical records were of purely physical ailments for which Wilder had sought help, and there is no reason to expect a doctor asked about an eye problem, or a back pain, or an infection of the urinary tract to diagnose depression. *Cf. Spellman v. Shalala*, 1 F.3d 357, 363 (5th Cir.1993); *Rivera v. Sullivan, supra*, 923 F.2d at 969. He is not looking for it, and may not even be competent to diagnose it. Because depression is a serious risk factor for suicide, doctors are constantly being urged to watch out for depression in their patients. The urging is needed because doctors who are not psychiatrists are slow to diagnose a mental illness, such as depression, that is not manifested in wild behavior. See, e.g., Harold C. Schulberg et al., "Major Depression in Primary Care Practice: Clinical Characteristics and Treatment Implications," 36 Psychosomatics 129 (1995). This may be an especially serious problem in the black community. See Diane R. Brown et al., "Major Depression in a Community Sample of African Americans," 152 Am.J.Psych. 373, 378 (1995). Wilder is black.

64 F.3d at 337. Plaintiff adds that he, too, is black. [Dkt. #14, at 10-11]. Plaintiff also points to *O'Connor–Spinner v. Colvin*, 832 F.3d 690, 696 (7th Cir. 2016), for the proposition that an ALJ may never reject a psychiatrist's "report for standing alone in diagnosing severe depression." [Dkt. # 14, at 13].

There are a number of problems with plaintiff's position. First, the citation to *O'Connor–Spinner* is based on a misreading of that case. The plaintiff ignores the fact that, on the very page cited in the brief, the Seventh Circuit made clear that there were "a decade of records from the community mental-health center" that the ALJ had ignored. 832 F.3d at 695. Obviously, that's not the case here; there were three years' of medical records, but significantly none noted any mental health symptoms. As for plaintiff's reliance on *Wilder*, there was no dispute that the plaintiff in *Wilder* suffered from disabling depression; the only issue was the onset. 64 F.3d at 336. Here, conversely, plaintiff denied he was disabled due to depression. Additionally, the court in *Wilder* speculated that the physicians who saw the plaintiff could easily miss signs of depression because

10

it "is not manifested in wild behavior." 64 F.3d at 336.

Moreover, while Dr. Amdur did not note "wild behavior," he did claim the signs he observed were "overt", "prominent", and "marked." It would be a leap for a reviewing court to rule that plaintiff's regular healthcare providers and a consultative examiner all repeatedly missed these "overt, prominent, and marked" signs and say that the ALJ wrongly accorded little weight to the one-time examiner's brief assessment. The court would have to ignore the medical record, not to mention the plaintiff's own testimony and claims. To do that would be to ignore substantial evidence in the record that supports the ALJ's decision. Significantly, the court is charged with reviewing the ALJ's decision, not to determine if it is right, or beyond a reasonable doubt, or even supported by a preponderance of the evidence, but to determine if it is supported by substantial evidence. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* It's easily met in this case.

That provides a segue to another problem with plaintiff's position. We note that plaintiff bristles repeatedly at the ALJ, noting, quite correctly, that it was plaintiff's counsel who first decided that plaintiff might have a mental impairment. [Dkt. #14, at 9; #23, at 3]. The plaintiff argues that the ALJ's mention of this fact in his assessment of the weight to be accorded Dr. Amdur's opinion is a fatal flaw, citing *Moss v. Astrue*, 555 F.3d 556 (7th Cir. 2009). But in that case, the only reason the ALJ provided for rejecting the opinion of a *treating physician* was *speculation* that the plaintiff had been referred to the physician by her attorney. 555 F.3d at 560-61. Here, there was no speculation about the referral – there clearly was a referral – and the ALJ provided other reasons for discounting Dr. Amdur's opinion. Moreover, the doctor in *Moss* was not offering a singular, outlying opinion that had nothing to do with the notes and observations of the plaintiff's regular

11

healthcare providers.

While *Moss* went on to question whether an attorney referral could ever be a legitimate basis for questioning a physician's report, 555 F.3d at 561, on other occasions the Seventh Circuit has acknowledged the potential for certain doctors to be biased in favor of patient's applications for benefits. The court has repeatedly observed that physicians may "bend over backwards" to assist a patient in obtaining benefits or do a favor for a friend. *Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir.2006); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The court has also noted that there are certain physicians most likely to attract patients who are thinking of seeking disability benefits who can bring similar bias to their opinions. *Hofslien*, 439 F.3d at 377. The law firm representing plaintiff regularly refers claimants to Dr. Amdur, *see, e.g., Rose v. Berryhill*, 2018 WL 6590561, at *1 (N.D. Ill. Dec. 14, 2018); *Reynolds v. Berryhill*, 2018 WL 6327004, at *2 (N.D. Ill. Dec. 4, 2018); *Jones v. Berryhill*, 2018 WL 4905020, at *3 (N.D. Ill. Oct. 9, 2018); *Keating v. Berryhill*, 2018 WL 4088063, at *4 (N.D. Ill. Aug. 27, 2018); *Lugo v. Colvin*, 2014 WL 3687235, at *17 (N.D. Ind. July 23, 2014), so perhaps he fills that bill, perhaps not. In any event, as already noted, Dr. Amdur's provenance was not the sole reason the ALJ provided for discounting his opinion.

Courts have broad discretion in allowing inquiry into the question of possible bias, which may be induced by a witness' likes, dislikes, fear of a party, or a witness' self-interest. Indeed, the range of circumstances from which a conclusion of bias can be drawn is, as Wigmore noted, almost infinite. *United States v. Abel*, 469 U.S. 45, 52 (1984). Thus, in *Talbot v. Electric Insurance Company*, 2018 W.L. 82247890 (M. D. La. 2018), the court would say "it is the direct referral by

the lawyer to the doctor that creates *a circumstance* that would allow the defendant to *explore possible* bias on the part of the doctor.")(Emphasis supplied). *Accord, Alvarez Crespo v. Home Depot USA, Inc.,* 2016 W L3854586 (S. D. Fla. 2016).[5] In other words, while a referral of the plaintiff by his lawyer to a doctor, without more, is an insufficient basis on which rejection of an Opinion can be based, it is not, however, a circumstance that must be ignored so long as *other* relevant evidence regarding the referral exists that may be an indicator of bias.

For example, the evidence of the referral may be but the first step in demonstrating an ongoing referring relationship between counsel and the physician. The referral of Plaintiff by her lawyer to a physician and/or *evidence of an ongoing referring* relationship of counsel with that physician is relevant on the issue of possible bias. *Feagins v. Wal-Mart Stores, Inc.*, 2017 WL 8944098, at *2 (M.D. La. 2017); *Cont'l Motors, Inc. v. Jewell Aircraft, Inc.*, 2013 WL 5670915, at *5 (S.D. Ala. 2013). And, not surprisingly, the frequency of employment of an individual and/or the compensation he or she receives are *relevant* (not dispositive) to potential bias and credibility. *See North v. Russell*, 427 U.S. 328, 337 (1976); *Abel*, *supra*; *Tumey v. Ohio*, 273 U.S. 510 (1927); *Evans v. Katalinic*, 445 F.3d 953, 955 (7th Cir. 2006); *Sapperstein v. Hager*, 188 F.3d 852, 857 (7th Cir. 1999); *United States v. Harris*, 185 F.3d 999, 1008 (9th Cir. 1999). Phrased differently, possible pecuniary interest of a witness is always relevant to the question of possible bias. *See generally United States v. Abel*, 469 U.S. 45 (1994); *United States v. Lindemann,* 85 F.3d 1232, 1243 (7th Cir.

---

[5]*See Feagins v. Wal-Mart Stores, Inc.,* 2017 WL 8944098 at *2 (M.D.La. 2017); *Crable v. State Farm Mut. Auto. Ins. Co.*, 2012 WL 1325831, at *4 (M.D. Fla. 2012)(Harris, J., concurring)(the relationship between counsel and the experts he retains in the case "is critical to the question of bias on the part of the witnesses."). *See also Continental Motors, Inc. v. Jewel Aircraft, Inc.*, 2013 WL 5670915 at *5 (S.D. Ala. 2013).

13

1996). That universal and time honored rule was never intended to be eradicated by *Moss*, and it did not pretend to do so.

As always, the facts of the case govern. *See Kingsley v. Hendrickson*, ––– U.S. –––, 135 S.Ct. 2466, 2473 (2015); *Barnhart v. Thomas*, 540 U.S. 20, 29 (2003);*Upjohn Company v. United States*, 449 U.S. 383, 390 (1981). What occurred here is not what occurred in *Moss*, where the ALJ bottomed his rejection of an expert's opinion on the speculative and conjectural possibility that the plaintiff's lawyer may have been the source of the referral. That for him was the beginning and end of the credibility inquiry. Here, the ALJ provided a number of sufficient reasons for discounting Dr. Amdur's opinion, apart from the fact that the referral to him came from plaintiff's lawyer. These reasons were sufficient for him to resolve the credibility question as he did, and the ALJ left no doubt that his credibility conclusion in this case would not have changed, regardless of the source of the referral to Dr. Amdur. Consequently, we cannot say that it was wrong for the ALJ to note Dr. Amdur's stand-alone opinion that plaintiff suddenly – in view of the previous years of medical records – suffered from overt and disabling depression was prompted by an attorney's referral, that referral coming after an initial denial of benefits. We certainly cannot say that the ALJ's observation requires the case to be remanded.

**B.**

That brings us to the matter of the other expert opinion at issue in this case, that of the vocational expert. At the hearing, the ALJ asked the vocational expert whether an individual who could perform light work, with the exception that he could not be on his feet more than four hours in a day and no more than two hours at a time, and could not work at heights, climb ladders, operate dangerous machinery, or frequently negotiate stairs, could perform jobs that existed in significant

numbers in the national economy. (R. 68-69). The vocational expert said yes, and cited packer (300,000 jobs), assembler (200,000 jobs), and sorter (50,000 jobs) as examples. (R. 69). The ALJ asked whether her testimony was consistent with the Dictionary of Occupational Titles ("DOT"), and the vocational expert explained that the DOT did not account for restrictions like no more than two hours of standing at a time and said that her examples were based on her education, training, and experience. (R. 70). Some of the jobs could be done sitting or standing. (R. 70-71).

Plaintiff's counsel then asked where the vocational expert got the numbers for the jobs she cited. The vocational expert explained that the numbers:

> come from the United States Department of Labor and the United States Census Bureau which can be found online through the Bureau of Labor Statistics website. And then I breakdown my numbers depending on an individual's limitations that are based on my training and professional experience in placing individuals into employment, performing job searches for my clients and performing labor market surveys.
> \* \* \*
> Basically, the statistics are estimates of the numbers of jobs from the . . . occupational groups, which are made up of several DOT codes.
> \* \* \*
> So that's where the number comes from and then I utilize my knowledge of the labor market and the DOT to further break down the numbers depending on the individual's limitations that were set forth in the judge's hypothetical.

(R. 73-74). The vocational expert then assured the ALJ that her estimates were conservative; they were the minimum number of jobs there might be. (R. 75).

The plaintiff has two issues with the vocational expert's testimony and the ALJ's reliance on it. First, the plaintiff argues that the vocational expert cannot have relied on her experience in formulating her opinion because at the time of the hearing, she had received her certification as rehabilitation counselor fourteen months before the hearing. [Dkt. #14, at 14]. It's a surprising argument, considering that counsel – the same attorney who raises it in plaintiff's brief – stipulated

15

to the vocational expert's qualifications at the hearing. (R. 67-68). Obviously, given the stipulation the argument is waived. *Mills v. Apfel*, 244 F.3d 1, 8 (1st Cir. 2001); *United States v. Fulford*, 980 F.2d 1110, 1116 n. 3 (7th Cir. 1992); *Stuart v. Gagnon*, 614 F. Supp. 247, 252 (E.D. Wis. 1985).

Second, the plaintiff argues that vocational expert had no basis to testify that the jobs she cited could be performed sitting or standing, especially when she said the numbers she gave were estimates. [Dkt. # 14, at 14-15]; *cf. Chavez v. Berryhill*, 895 F.3d 962, 968–69 (7th Cir. 2018)("The VE necessarily must approximate, and there is no way to avoid uncertainty in doing so. The law recognizes and respects these realities and limitations. The agency's regulations do not mandate a precise count of job numbers."). Plaintiff contends that, as a result, the finding that he can perform jobs that exist in significant numbers in the national economy is unsupported, citing *Britton v. Astrue*, 521 F.3d 799 (7th Cir. 2008). But, again, the time to have objected to the vocational expert's basis for the job numbers was at the hearing.

Once plaintiff's counsel arrived at the vocational expert's explanation of the basis for her testimony, plaintiff's counsel did nothing further. She did not challenge that basis or object. (R. 74-77). As such, she has forfeited this argument. *Brown v. Colvin*, 845 F.3d 247, 254 (7th Cir. 2016)(Plaintiff "forfeited these arguments by failing to object to the testimony during the administrative hearing."); *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009) (claimant forfeited argument regarding reliability of data underlying vocational experts' job-numbers opinions by failing to object during hearing); *Zblewski v. Astrue*, 302 F. App'x 488, 494–95 (7th Cir. 2008)("[Plaintiff] did not challenge that assertion at his hearing, and an ALJ is entitled to rely on unchallenged VE testimony."); *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004)(same).

In her reply brief, plaintiff appears to argue that the ALJ violated SSR 00-4p by indicating

16

in his decision that the vocational expert's testimony was consistent with the DOT. [Dkt. #23, at 6]. It is, of course, too late to raise this argument in a reply brief. *McCarty v. Menard, Inc.*, 924 F.3d 460 n.2 (7th Cir. 2019); *Frazee v. Berryhill*, 733 F. App'x 831, 834 (7th Cir. 2018). A reply brief is for replying, not raising new arguments. *Dexia Credit Local v. Rogan,* 629 F.3d 612, 625 (7th Cir. 2010); *Hussein v. Oshkosh Motor Truck Company*, 816 F.2d 348, 360 (7th Cir. 1987). Moreover, as the DOT does not address the subject of whether jobs have sit/stand options, the vocational expert's testimony did not necessarily *conflict* with the DOT. *See Zblewski*, 302 F. App'x at 494.

## CONCLUSION

The defendant's motion for summary judgment [Dkt. 21] is granted and the ALJ's decision is affirmed.

ENTERED:_____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 1/9/20